NOT DESIGNATED FOR PUBLICATION

No. 117,931

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
J.L.A. and N.J.K.R.,
Minor Children.


MEMORANDUM OPINION


Appeal from Sedgwick District Court; DANIEL T. BROOKS, judge. Opinion filed March 2, 2018. Affirmed.


*Jordan E. Kieffer*, of Dugan & Giroux Law, Inc., of Wichita, for appellant natural mother.


*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.


Before GARDNER, P.J., GREEN and SCHROEDER, JJ.


PER CURIAM:  Mother appeals, claiming the district court erred in finding there was clear and convincing evidence to terminate her parental rights. We find Mother's arguments unpersuasive, and we affirm the district court.


On October 24, 2014, the State filed a child in need of care (CINC) petition for J.L.A. because Mother was in jail. On March 3, 2015, the State filed a child in need of care petition for N.J.K.R., a newborn, alleging Mother was homeless. Mother admitted the children were CINC by stating she was not contesting allegations in each petition.


On June 15, 2016, the State moved to terminate Mother's parental rights to both J.L.A. and N.J.K.R. The termination hearing took place on August 17, 2016, and August 24, 2016. The State called four witnesses:  Linda Crenshaw, Mother's therapist from

1

January 2015 to December 2015; Mother; Syreeta Pryor, a family support worker at St. Francis Community Services (St. Francis); and Christina Jordan, a reintegration social worker at St. Francis. Mother called Jessica Wingler, her therapist at Harbor House, and proffered the testimony of her daughter, T.C., and ex-husband R.C.

Crenshaw testified she first met with Mother on January 7, 2015. She closed Mother's case on March 16, 2016, because Mother had not attended an appointment since December 14, 2015. Crenshaw diagnosed Mother with an adjustment disorder with anxiety symptoms and discussed Mother's unhealthy relationships. Crenshaw noted Mother was consistently focused on her relationships with other people instead of her children. In total, Mother only attended 19 of her 34 appointments with Crenshaw.

After Crenshaw, Mother testified. She indicated she planned to start a job the following day. Mother testified she had a total of six jobs during the pendency of the case but had not been able to maintain any of them for longer than a few months. Mother currently lived at Harbor House, a shelter for victims of domestic violence, and had lived in three different places since March 2016. Prior to March 2016, she lived at the same place for a year, but stopped paying rent in November 2015 and was evicted in March 2016. Mother acknowledged she was on zero-tolerance probation for felony theft and traffic cases in Sedgwick and Harvey Counties and owed more than $7,000 in restitution. She indicated she was doing therapy at Harbor House with Wingler and had been for about six weeks. Mother also testified she was supposed to be taking Ativan for her anxiety but was not because she did not have insurance.

Mother also discussed her relationship with J.D., a former boyfriend. She met J.D. at a bus station in April 2016, and did not know him very long before she moved in with him. She began showing him pictures of her kids after two or three days and J.D. brought up the possibility of adopting J.L.A. and N.J.K.R. Mother indicated she was no longer in a relationship with J.D., and she was no longer living with him because she needed to get

herself together and he needed to get himself together. Despite this, Mother indicated she was engaged to J.D. Mother was unable to say whether she was going to stay in a relationship with J.D.

Pryor indicated Mother told her she left J.D. because he threatened her and her children, and this was why Mother went to Harbor House. Pryor testified Mother ended a visit early in order to file a protection from abuse order against J.D. Pryor also stated she had concerns about extending visitation because Mother was unable to care for the children for long periods of time without help from her or another St. Francis worker. Pryor felt Mother had difficulty focusing on both children at the same time.

Jordan testified Mother had completed a lot of her court orders but had concerns about Mother's relationships with men. She was concerned Mother seemed to prioritize her relationships with men over her children's needs. Jordan indicated she did not believe Mother would follow a court order to stay away from J.D. Jordan testified she had concerns about Mother's ability to meet J.L.A. and N.J.K.R.'s emotional, physical, and developmental needs. She recommended the court terminate Mother's parental rights because it was not in the children's best interests to be reintegrated with Mother.

Wingler testified she worked for Catholic Charities meeting with women who entered the shelter due to domestic violence, discussing their immediate needs, and helping set up long-term services. She indicated she had about five appointments with Mother between July 20, 2016, and August 17, 2016. She indicated they had focused on trying to set up longer-term services in the community but had been unsuccessful. Wingler indicated she tried to meet with Mother weekly but acknowledged her services are crisis-oriented and interruptions could occur. Wingler also acknowledged she only provides short-term services and Mother continuing individual therapy with her was not ideal.

Mother also proffered the testimony of T.C., her oldest daughter, and R.C., her ex-husband. T.C. would have testified Mother was an active part of her life and has the ability to be stable. T.C. believed Mother would be able to focus on the children and protect them. Similarly, R.C. would have testified Mother could be a very good mom and could take care of the children.

After hearing argument, the district court recessed briefly. When it returned, it noted Mother clearly loved these children. However, it found St. Francis had made reasonable efforts to reintegrate the family and none of their efforts had worked. It found by clear and convincing evidence that, by reason of her mental health problems and her failure to follow through with a reasonable plan or to adjust her circumstances to meet the needs of the children, Mother was unfit as a parent and it was contrary to the children's best interests to "hold them back" to give Mother a chance to demonstrate stability. The district court terminated Mother's parental rights.

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the custody, care, and control of the child, the parent is entitled to due process of law. *In re Adoption of A.A.T.*, 287 Kan. 590, 600-01, 196 P.3d 1180 (2008); see *In re X.D.*, 51 Kan. App. 2d 71, 74, 340 P.3d 1230 (2014) (the right to be the legal parent of a child is a fundamental right).

The Kansas Legislature has specified that the State must prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2017 Supp. 38-2250. In addition to CINC adjudications, the clear and convincing evidence standard of proof applies to all termination of parental rights cases. K.S.A. 2017 Supp. 38-2269(a).

4

> "When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated. [Citation omitted.]" *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011) (termination of parental rights).

See *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008) (child in need of care finding).

In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

The revised Kansas Code for Care of Children provides that the court may terminate parental rights when a child has been adjudicated a CINC. K.S.A. 2017 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in making a determination of unfitness. K.S.A. 2017 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2017 Supp. 38-2269(c). Any one of the factors in K.S.A. 2017 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2017 Supp. 38-2269(f).

Here, the district court cited K.S.A. 2017 Supp. 38-2269(b)(1), (7), (8), and (9) to terminate Mother's parental rights. It found clear and convincing evidence Mother was unfit and her unfitness was unlikely to change in the forseeable future. K.S.A. 2017 Supp. 38-2269(b) states, in relevant part:

> "In making a determination of unfitness the court shall consider, but is not limited to, the following, if applicable:

(1) Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child;

. . . .

(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child; and

(9) whether the child has been in extended out of home placement as a result of actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply."

Mother contends there was not substantial competent evidence supporting the district court's findings of unfitness. She argues her situation was "drastically different" than at the beginning of the case. She believes her progress "was not given its due weight" and the "minor criticisms" that remain do not raise to the level of clear and convincing evidence and contends the district court erred when it found she should be considered unfit for the foreseeable future. Essentially, Mother asks us to reweigh the evidence. We cannot. See *In re B.D.-Y.*, 286 Kan. at 705.

Further, despite her contentions otherwise, substantial competent evidence supports the district court's findings. Mother worked six different jobs during the pendency of the case, but did not work any of them for more than a few months. Between March and August, Mother lived at three different places, had been homeless on at least one occasion, and was living at Harbor House at the time of trial. For much of the pendency of the CINC action, Mother was not actively seeing a therapist for her mental health issues and, at least at trial, Mother was not taking her anxiety medication. In addition, Pryor had concerns about extending the length of visitation because Mother was unable to care for the children for long periods of time without help. Mother also had trouble with having both children visit at the same time. Jordan expressed concern that Mother prioritizes relationships with men over her children's needs. Jordan was

6

particularly concerned about Mother and J.D.'s relationship. Mother told Jordan the reason she moved into Harbor House was because J.D. threatened her and her children. However, Mother also testified she was currently engaged to J.D. Viewed in the light most favorable to the State, a rational fact-finder could have found it highly probable Mother was unfit and it would not change in the foreseeable future. See *In re D.T.*, 30 Kan. App. 2d 1172, ¶ 4, 56 P.3d 840 (2002) ("Courts must strive to decide termination cases in 'child time,' rather than 'adult time.'").

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2017 Supp. 38-2269(g)(1). The district court is in the best position to make findings on the best interests of the children; its judgment will not be disturbed absent an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). "A district court abuses its discretion when no reasonable person would agree with its decision or the decision is based on a legal or factual error." *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2, 336 P.3d 903 (2014).

The district court found it was contrary to the best interests of the children to "hold them back" to give Mother more chances to demonstrate stability. N.J.K.R. has been in foster care his entire life. As a child with autism, J.L.A. needs stability. In the nearly two years the case was pending, Mother had not shown stability. Mother was unable to maintain employment or housing. She had not consistently addressed her mental health needs. Reasonable people could agree termination of Mother's parental rights was in the best interests of the child. The district court did not err when it terminated Mother's parental rights to J.L.A. and N.J.K.R.

Affirmed.

7